Frank MILLER, Respondent (Plaintiff),

v.

MULTIPLEX FAUCET COMPANY, a Corporation, Appellant (Defendant, Third-Party Plaintiff),

and

Fred Bryant, Appellant (Third-Party Defendant).

No. 46320.

Supreme Court of Missouri,

Division No. 1.

July 14, 1958.

Norris H. Allen, William B. Anderson, Anderson, Gilbert, Wolfort, Allen & Bierman, St. Louis, for appellant and third party plaintiff.

Walther, Barnard, Cloyd & Timm, George W. Cloyd, St. Louis, for third party appellant.

Lyng, MacLeod & Davidson, Russell N. MacLeod, St. Louis, for respondent.

VAN OSDOL, Commissioner.

Plaintiff, Frank Miller, had verdict and judgment for $15,000 against defendant, Multiplex Faucet Company, which defendant as third-party plaintiff had verdict and judgment for a like amount against third-

party defendant, Fred Bryant. Defendant and third-party defendant have appealed.

Defendant-appellant Multiplex contends that the trial court erred in overruling defendant's motion for a directed verdict; and that the amount of the jury's award is excessive. Third-party defendant-appellant Bryant joins in these contentions.

At plaintiff's request the trial court had submitted negligence of defendant through its agent and servant (Bryant) in pushing or swinging the free end of a skid or bundle of metal attached to a hoist or crane while unloading metal from a truck at defendant's plant so as to cause the hoist or skid to collide with other crates of metal causing them to fall upon and injure plaintiff.

Plaintiff was injured on February 16, 1955. He was in the employ of Triangle Express, but hauled "steady" for Hubbell Metals Company "under lease" of a Chevrolet truck. On February 16th plaintiff had a delivery of metals to defendant Multiplex (and to other consignees) and proceeded from Hubbell Metals on North Euclid in St. Louis County to the plant of defendant Multiplex on Ferguson. Plaintiff was driving the Chevrolet truck which had an open bed with steel sides extending up two and one-half feet. In loading the truck, two crates of metal, each four inches thick, four feet wide and twelve feet long, had been set edgewise against the right side of the truck bed. The total weight of these two crates was about 2,300 pounds. The crating material was of wood, and four metal straps or bands three-fourths of an inch wide held the crated metal together. The two crates of metal were destined to a consignee other than Multiplex. They had been fixed in the truck bed by double strands of wire at four or five points along the length of the crates. The wires were attached to nails which had been driven into the wooden crating and clinched. The wires extended up over the crates and were fastened to cleats on the outside of the truck bed.

Two other bundles of metal sixteen feet long had been laid on the floor to the left of the two crates above mentioned. Two other and shorter bundles of steel, each weighing approximately one thousand pounds, had been laid on the floor of the truck bed farther to the left "towards the front end of the truck." These last-mentioned four articles were destined to Multiplex. Two coils of steel (wire) had been placed on the floor, one on top of the other, on the left side near the rear end of the truck bed, and along the left-hand side and at the front end there were "scattered around" small cartons of the "carry-off kind."

Upon arrival at the Multiplex plant, plaintiff backed the truck to a door, the sill of which was even in elevation with the floor of the truck bed; and third-party defendant Bryant, who was defendant's shipping and receiving clerk, prepared to unload those articles comprising the parts of the truck load which were destined to defendant Multiplex. Plaintiff Miller and Bryant saw that the wires which had been used to hold or fix the two crates edgewise against the right side of the truck had become slackened. Bryant testified the crates were leaning towards the inside of the truck, "I would say about a foot." Bryant procured a chain from inside defendant's plant. The "hook-end" of the chain was attached to one of the bands or binders of the inner of the two crates, the hook being slipped under the band and then hooked through a link of the chain immediately above the band. The remaining length of the chain was passed over the side of the truck bed and was attached by Bryant to cleats on the outside of the truck. Then Bryant, operating an electric hoist or crane, brought the hoist out over the truck bed. The two longest bundles of steel near the crates at the right of the truck bed were successfully unloaded, and Bryant was proceeding to unload the two (shorter) bundles. The first of these two bundles was successfully hoisted and moved into defendant's plant; and the hoist was then attached

to the second, but, when it was raised, the end of the bundle became entangled in the coils of steel near the left rear of the truck bed.

Plaintiff testified, "* * * he (Bryant) was fighting it in there and he asked me to come in and give him a hand. * * * I stepped in there to give him a hand, to see what was holding it and I saw they were wiggling up there, and about the time I glanced up, he was pushing on it real hard. Before I had a chance to do anything the crate was on top of me, banged me and mashed me against these coils. Both of the crates (which had been set edgewise along the right side of the bed) fell down on me." Plaintiff testified that Bryant, in endeavoring to free the entangled end of the bundle, had become aggravated and had struck the crates with the hoist or free end of the bundle causing the crates to fall. Plaintiff testified, "I heard the bundle smack into the crate; yes, sir. * * * I saw the crane hit the crate and then it hit me." Defendant's counsel during cross-examination asked plaintiff, "At any rate, Fred got aggravated and he slams this big bunch of steel against the others?" Plaintiff in answering added the clause, "Trying to break it loose."

It is observed that plaintiff unequivocally testified that Bryant so operated the hoist or crane as to bring it or its load into contact with the crates standing edgewise along the right side of the truck bed.

March 4, 1955, sixteen days after he was injured, plaintiff had been questioned by a lawyer-investigator, and a reporter took down the interrogation in shorthand. Plaintiff did not sign the transcribed statement, which was in question and answer form, but on the witness stand testified that he had answered the investigator's questions "to the best of his knowledge." It is pertinent here to say that the statement did not include an answer, or assertion, or any suggestion that Bryant, in the operation of the hoist, had brought it or its load into contact with the crates. In the statement plaintiff had said, "* * * I was between the crates and steel coils with my back to the crates. *I don't know how* in the hell *they got loose* but the first thing I knew they came down and caught me in the small of my back here (indicating). *We didn't hear them break loose or nothing.*" A further question and answer appears in the statement—"Q. You don't have any idea what caused that chain you put on to come loose? A. No, I fastened the top of the chain and the kid (Bryant) fastened the bottom. *I didn't hear it slip or break or what happened.*" (Our italics.) When confronted with these portions of the prior statement plaintiff, in explanation, said, "I told them (the investigator and reporter) they had hit the end of that crate and when I said I didn't know how in the hell they got loose, it may have been hit above that cleat, when he brought them up, which would have brought them over on him."

In supporting the contention of error in overruling defendant's motion for a directed verdict, appellants, defendant Multiplex and third-party defendant Bryant, urge that plaintiff failed to adduce evidence sufficient to make a submissible case on the issue of negligence submitted. It is argued that all of the evidence tending to support plaintiff's case was the testimony of one witness, plaintiff; that plaintiff's testimony to the effect that Bryant so operated the crane as to bring it or its burden into contact with the crates (considered in connection with plaintiff's testimony that he had given the quoted answers in his prior statement "to the best of his knowledge") fails to measure up to the legal requirements of substantiality and probative force. It is said the plaintiff's direct testimony and his testimony relating to his former statement rendered his testimony so conflicting and contradictory as to be self-destructive, leaving to mere speculation and conjecture the question as to what caused the crates to fall. Appellants cite and quote from Adelsberger v. Sheehy, 332 Mo. 954, 59 S.W.2d 644, at page 647, as follows,

"Where a party relies on the testimony of a single witness to prove a given issue, and the testimony of such witness is contradictory and conflicting, one version thereof tending to prove the issue, the other tending to disprove it, with no explanation of the contradiction, and no other fact or circumstance in the case tending to show which version of the evidence is true, no case is made, and the jury should not be permitted to speculate or guess which statement of the witness should be accepted. On the other hand, if, in such a case, the conflicting and contradictory statements of the witness are reasonably explained, or if there are other facts and circumstances in the case tending to show which story of the witness is true, and from a fair consideration of all the facts and circumstances in evidence a jury could reasonably determine which statement of the witness should be accepted as true, then the credibility of the witness and the weight to be given to his testimony are questions for the jury."

The Adelsberger case has been cited and the above quotation frequently quoted in whole or in part. See Goslin v. Kurn, 351 Mo. 395, 173 S.W.2d 79; Sparks v. Auslander, 353 Mo. 177, 182 S.W.2d 167; Pettis v. St. Louis Public Service Co., Mo.Sup., 240 S.W.2d 909; Crandall v. McGilvray, Mo.Sup., 270 S.W.2d 793; Stoll v. First Nat. Bank of Independence, 234 Mo.App. 364, 132 S.W.2d 676; Foerstel v. St. Louis Public Service Co., Mo.App., 241 S.W.2d 792; Tyler v. Board of Ed. of City of St. Louis, Mo.App., 306 S.W.2d 601.

As illustrated in Goslin v. Kurn, supra, the principle stated in the Adelsberger case is applicable when a single witness testified to prove a given issue in the trial of a case, and the testimony of such witness at the trial is contradictory and conflicting, one version thereof tending to prove the issue, the other tending to disprove it. Observe in the Goslin case that the plaintiff's answers on cross-examination as to the exist-

ence of the custom were studied carefully by this court to determine whether or not such answers were in conflict with or contradictory to and destructive of plaintiff's testimony on direct examination. But plaintiff Goslin's prior statement to a claim agent relating to the custom was something else. It went only to plaintiff's credibility as a witness. Goslin v. Kurn, supra.

■ This brings us to the rule that prior statements of a witness, even though the witness is a party, while admissible for impeachment, do not destroy the prima facie probative effect of the contrary testimony of the witness at the subsequent trial. Goslin v. Kurn, supra; Higgins v. Terminal R. R. Ass'n of St. Louis, 362 Mo. 264, 241 S. W.2d 380; Moses v. Kansas City Public Service Co., 239 Mo.App. 361, 188 S.W.2d 538; Swift v. St. Louis-San Francisco R. Co., Mo.App., 15 S.W.2d 964.

■ However, as we have intimated, appellants in effect contend that on cross-examination plaintiff reaffirmed the truth of, adopted and made the prior statement a part of his testimony at the trial; and that the answers to the questions, which we have quoted and italicized, supra, show that plaintiff had in fact or in conclusive effect negatived any knowledge on his part of any contact between the hoist or skid in causing the crates to fall. Appellants urge, and without deciding we shall assume in examining appellants' contentions that the principle as stated in the Adelsberger case is applicable here. Say appellants, it is obvious "that the plaintiff didn't know what caused the crates to fall * * *." Appellants particularly stress the language "or nothing" in the sentence—"We didn't hear them break loose or nothing," and the language "or what happened" in the sentence—"I didn't hear it slip or break or what happened."

It is true there was no answer, assertion or suggestion in plaintiff's prior statement of March 4, 1955, that Bryant caused the hoist or its load to come into contact with the crates. And plaintiff in stating, while

on the witness stand, that he had told the investigator and reporter that the crane or hoist or its burden struck the crates was mistaken, assuming the reporter correctly took down and transcribed all that was said. Plaintiff qualified that testimony by saying that he did not recall whether or not he had told "either of these men that Freddie hit the crate with another crate * * * I don't know as I didn't tell him." And he explained that at "that time I was in terrific pain; I wasn't worried about no claims or nothing. I was worried about getting my health back and becoming healthy; they came right after I came out of the hospital."

There is no direct contradiction or conflict in plaintiff's testimony at the trial (even considering plaintiff's answers in the former statement a part of his testimony at the trial) on the issue of whether Bryant struck the crates with the hoist or skid. A jury could reasonably construe the answers in the statement which we have italicized, supra, as conveying plaintiff's quandary as to the way the chains and wires became detached when the crate was struck by the hoist or skid. Shortly before the casualty, plaintiff and Bryant had chained the crates; so, although one saw or heard and knew the "crates were hit," it is reasonable that one still might wonder why it was, or how it happened that the wire and chain, when the crates were struck by the free end of the skid or crane, were so loosened as to permit the crates to fall. Plaintiff testified —"After that (the crate or crates) was hit as I say I didn't hear those wires break or that chain come off. * * * They (the crates) would have been standing today, if they hadn't been hit. * * * I didn't know for sure whether that chain turned when the recoil hit it, whether the chain slid out or not; I couldn't say definitely whether it did."

The witness (plaintiff) in testifying and in his prior statement used words—"it," "they," "them," and "that"—variously in speaking of the chain, the wires, the crate, the crates, the hoist or crane, and the skid or bundle of metal. Because of this, his testimony is difficult of precise interpretation, but we think the jury reasonably could have and did construe the witness' language used in the prior statement including "or nothing" and "or what happened" as alluding only to the manner or way or how it happened that the wires and chain were detached or loosened permitting the crates to fall when hit by the crane or the free end of the crane's burden, the bundle of metal or skid.

We have the opinion that plaintiff's testimony was not so conflicting or contradictory as to have no substantial probative effect; and we hold the trial court did not err in overruling defendant's motion for a directed verdict.

■ Plaintiff was thirty-four years of age at the time he was injured. The two crates which fell upon him weighed 2,300 pounds; they pinned him against the coils of metal or wire. Fifteen or twenty men lifted the crates off of him, and he was taken by ambulance to St. John's Hospital where he was confined for ten days. Plaintiff had sustained a crushing injury to the lower back and thighs. His back was giving him great pain and he frequently was receiving "shots" to ease the pain. He was in bed with "nothing but a board beneath"; but he was using an anchor board so he could keep trying to pull himself up. When he got out of the hospital he was bent over "pretty bad." A vain effort was made to provide a brace. April 5, 1955, plaintiff was again hospitalized for twelve days. His body was put in a cast, but the pain was so terrific that the cast was removed and the physician had a second brace provided. This vest-like brace has two pads or cushions, and stays at the back; its tension may be increased by straps with buckles. The brace envelopes the back, hips and parts of the buttocks. At the time of trial plaintiff was using this brace while working. Sometimes, while at work, he had tried to take

it off, but he was obliged to get back into it. Plaintiff cannot do any heavy work; his legs tire; he has severe headaches twice a week; he still has pain running down the right leg, although pain in the left leg is now relieved. He thinks there has been no improvement in the condition of his back.

A physician who had examined plaintiff a few days before the trial said plaintiff stood with his back tense and in slight flexion. There was no definite spasm, no atrophy of the back muscles, no fixed deformity and, clinically, his back was straight in the lateral plane. He had hypersensitivity over the lumbar-sacral area and surrounding lower back tissues. X rays had disclosed a slight scoliosis to the left. This condition was disclosed by X rays taken soon after plaintiff was injured and probably existed prior to his injury. However, the curve of the spine shown in subsequent X rays is slightly more pronounced. A doctor could not answer "with reasonable medical certainty" whether plaintiff is going to have pain in the future.

Plaintiff's weekly earnings were about $100. Plaintiff returned to his work in June, 1955. He had been off work for a little over four months, having lost something like $1,800 in wages. Medical and hospital expenses were approximately $619.

Cases cited by appellants and respondent on the issue of excessiveness of the award have been examined and are seen to involve injuries which are not comparable to those sustained by plaintiff, except, perhaps, the case of Zichler v. St. Louis Public Service Co., 332 Mo. 902, 59 S.W.2d 654. The Zichler case is supportive of the view that the award in our case was excessive. In the Zichler case, decided in 1933, plaintiff Zichler, thirty-nine years old, sustained injury in the lumbar region when thrown from his seat to the floor of a streetcar. Our examination of the medical evidence as reported in the Zichler opinion indicates the damaging results of the injury were somewhat like but more severe than those resulting from the crushing blow plaintiff in our case sustained. In the Zichler case the evidence considered from the standpoint favorable to plaintiff Zichler showed that his injury was permanent, and the pain which he experienced was not likely to be alleviated; and there was evidence Zichler, a working man, undoubtedly suffered a severe injury to the spinal column constituting a disability, inasmuch as manual work would cause pain and increase the disability. His earning capacity was much impaired. This court reduced the amount of the award from $15,000 to $10,000. We realize that the purchasing power of the dollar is much less at this time than in 1933; but, as stated, we believe plaintiff Zichler's injuries were shown to be more disabling than the instant plaintiff's, and we see that plaintiff Zichler was unable to carry on at his regular work, but was obliged to accept employment at a substantially lesser wage.

In the instant case, we have seen that plaintiff had sustained no fracture of any of the bony structure of the body and it is inferred he has carried on in his work since some four months after his injury. The curvature of the spine was said by plaintiff's witness to be a minimum, and there was no evidence tending to show the intervertebral processes were damaged or injury to the spine, other than the scoliosis as noted. All other objective findings were negative. We give full credence to the testimony tending to prove the scoliosis and to plaintiff's testimony of the severe pain which he had experienced and now experiences, and we recognize the inconvenience and annoyance of plaintiff's having to wear the brace when working. However, here we do not have the evidence of a substantially disabling injury which was shown to be permanent. Having regard for the factors which are to be taken into account in treating with the issue of the excessiveness of an award, we have the view the award in this case was excessive in the amount of $5,000.

If plaintiff within fifteen days enters a remittitur of $5,000, the judgment shall

stand affirmed for $10,000 as of the date of its rendition; otherwise, the judgment should be reversed and the cause remanded.

It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.